**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAE HWAN HWANG, and | : | |
| YOUNG HWANG | : | |
| v. | : | |
| BUTCHER BOY LIMITED d/b/a | : | |
| BUTCHER BOY, and IGB SYSTEMS | : | |
| LTD. d/b/a BUTCHER BOY, and | : | Civil Action No.: 2:09-CV-1178 |
| WILLIAM LASAR III d/b/a BUTCHER | : | |
| BOY, and BUTCHER BOY, and | : | |
| LASAR MANUFACTURING COMPANY, | : | |
| INC. d/b/a BUTCHER BOY, and | : | |
| WESTGLEN CORPORATION d/b/a | : | |
| BUTCHER BOY, and   AMERICAN | : | |
| MEAT EQUIPMENT CORP.   d/b/a | : | |
| BUTCHER BOY, and AMERICAN MEAT | : | |
| EQUIPMENT LLC d/b/a BUTCHER BOY | : | |
| and, BUTCHER BOY, and | : | |
| SIEMENS-FURNAS CONTROLS, and | : | |
| FURNAS ELECTRIC CO. | : | |

## ORDER

AND NOW this_____day of_____, 2010, it

is hereby ORDERED  and DECREED that Defendant, William Lasar III's Motion to Dismiss for

Lack of Personal Jurisdiction is hereby DENIED.

BY THE COURT:

_____
                                                    J.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JAE HWAN HWANG, and | : |
| YOUNG HWANG | : |
|       v. | : |
| BUTCHER BOY LIMITED d/b/a | : |
| BUTCHER BOY, and IGB SYSTEMS | : |
| LTD. d/b/a BUTCHER BOY, and | :   Civil Action No.: 2:09-CV-1178 |
| WILLIAM LASAR III d/b/a BUTCHER | : |
| BOY, and BUTCHER BOY, and | : |
| LASAR MANUFACTURING COMPANY, | : |
| INC. d/b/a BUTCHER BOY, and | : |
| WESTGLEN CORPORATION d/b/a | : |
| BUTCHER BOY, and   AMERICAN | : |
| MEAT EQUIPMENT CORP.   d/b/a | : |
| BUTCHER BOY, and AMERICAN MEAT | : |
| EQUIPMENT LLC d/b/a BUTCHER BOY | : |
| and, BUTCHER BOY, and | : |
| SIEMENS-FURNAS CONTROLS, and | : |
| FURNAS ELECTRIC CO. | : |

## PLAINTIFF'S ANSWER TO WILLIAM LASAR, III.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### STATEMENT OF FACTS

Plaintiffs brought this product liability lawsuit against Defendants after Plaintiff,

Jae Hwan Hwang's hand and forearm were amputated in a meat grinder. The accident occurred

in a grocery store located on Frankford Ave. in Philadelphia, Pennsylvania. (See Complaint).

The meat grinder is named "Butcher Boy," which can easily been seen on the outside of the

machine. (See Photograph marked Exhibit "A"). The meat grinder also has an identification tag

stating "Butcher Boy" and identifying "Lasar Mfg. Company, Inc." as the manufacturer. (See

Photograph marked as Exhibit "B"). Lasar Mfg. Company, Inc. shows an address of 2540 East

114 St., Los Angeles, California. (See Exhibit "B").

After investigation, Plaintiffs learned that Lasar Mfg. Company, Inc. has been sued on

numerous occasions for the same dangerous product in other jurisdictions with almost identical

injuries to Mr. Hwang. (See Verdict Search article marked as Exhibit "C"). The Verdict Search

article indicates that William Lasar III was the owner/president of the company called Lasar Mfg. Company, Inc., and it indicates the background of Lasar Manufacturing.  Now that Mr. Lasar has been found and served, Plaintiffs intend to subpoena the trial transcripts from the jury trial where the jury found against William Lasar III in a punitive damages phase of the trial for intentional spoliation of evidence and conscious disregard of the safety and rights of others.  (See Exhibit "C" and <u>Victor Ortega v. Westglen Corporation; No.</u> TC 006 859 (Superior Court Los Angeles, Compton, California).

In particular, the jury in the <u>Victor Ortega</u> case found that William Lasar III took over the company after his father's death.  He placed it in immediate bankruptcy, Chapter 11 and then Chapter 7.  The two bankruptcies were caused by approximately **200** various personal injury claims asserted against it, which consisted mostly of amputations related to its meat processing equipment.  From 1984 to 1989, William Lasar III gutted Lasar Manufacturing by transferring its assets, functions and employees to other wholly owned and controlled companies in the United States, Canada and Scotlane.  The primary beneficiary was Westglen, although it was nothing but a name change.  Defendants also engaged in a destruction of accident reports and financial records.  (See Exhibit "C").  Plaintiff believes that when they receive the evidence, it will prove the averments in the Complaint.

Furthermore, at the time of the filing of the Complaint, it was Plaintiff's belief that William Lasar III was still in business in the Country of Scotland in a business called IGB Systems and Butcher Boy Limited.  In a self-proclaimed web site, the history of Butcher Boy is explained.  (See web site of IGB Systems marked as Exhibit "D").  It explains that William Lasar II began Butcher Boy and eventually moved to Los Angeles, California to start Lasar Machine Works, which eventually evolved into Lasar Manufacturing Company, Inc.  It also

states that over the next 55 years, Lasar created hundreds of machines for the meat processing industry. In 1980, William Lasar II and his son, William Lasar III, established "Butcher Boy Limited in Scotland." (See Exhibit "D"). It goes on to further state that "Today, Butcher Boy Limited is the world centre for Butcher Boy. From our 60,000 sq. ft. factory in Scotland, we design, manufacture and market Butcher Boy machines, processing systems and replacement parts to most countries of the world." (See Exhibit "D").

After Mr. Lasar received the Complaint, he called Plaintiff's Counsel and informed her that he is the correct person, he is retired in Texas and he did not have any insurance. (See Affidavit of Counsel marked as Exhibit "E"). He also gave Counsel some background information about the companies and stated "It was always so unfortunate. We had guards on the machines and people would take them off." (See Exhibit "E"). A read of Mr. Lasar's Affidavit makes it look as though Counsel served the wrong person. This is simply not true.

William Lasar III was the owner of Lasar Manufacturing Company, Inc. when the machine was manufactured and placed into the stream of commerce. The machine was bought by American Family Markets in Philadelphia, Pennsylvania where the accident occurred.

## STATEMENT OF QUESTIONS INVOLVED

1. Should the Motion for Lack of Personal Jurisdiction be DENIED when Defendant, William Lasar III was the Principal of Lasar Manufacturing Company, Inc. who Directed His Activities At Pennsylvania by Selling Meat Grinders to Companies Located in Pennsylvania?

   SUGGESTED ANSWER: YES

2. If the Motion to Dismiss is Not Outright Denied, Should Plaintiffs be Permitted to Engage in Discovery for Additional Evidence as it Relates to the 12(b)(2) Motion?

   SUGGESTED ANSWER: YES

**ARGUMENT**

A Defendant may raise lack of personal jurisdiction defense pursuant to Federal Rule of

Civil Procedure 12(b)(2).  The burden then shifts to the Plaintiff to prove that jurisdiction exists

in the forum state.  IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 257 (3d Cir. 1998).  A court

must construe all facts in the light most favorable to the plaintiff when determining whether

personal jurisdiction exists.  Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3rd Cir. 2002).  A

Plaintiff must demonstrate "with reasonable particularity" contacts between the defendant and

the forum sufficient to support a prima facie case in favor of the exercise of personal jurisdiction

by the forum state.  Stubbs. V. Terry Collins (2010 WL 724448 (W.D.Pa.) (citing Burger King

Corp. v. Rudzewicz, 471 U.S. 462, 477 (1986).

There are two types of personal jurisdiction:  general and specific.  General jurisdiction

results from, among other things, "systematic and continuous" contact between a non-resident

defendant and the forum state.  See Int'l Shoe Co. v. Washington, 326 U.S. 310, 320, 66 S.Ct.

154, 90 L.Ed. 95 (1945).  General jurisdiction allows the forum state to exercise jurisdiction over

non-resident defendants.  Specific jurisdiction allows for the exercise of personal jurisdiction

over a non-resident defendant for actions arising out of the defendant's contact with the forum.

See Mellon Bank v. Farino, 960 F.2d 1217, 1223 (ed Cir. 1992), Nat'l Assn. v. Farino, 960 F.2d

1217, 1221 (3rd Cir. 1992), Spuglio v. Cabaret Lounge, 344 Fed. Appx. 724, 2009 WL 2917119

(C.A.3(Pa.))).There is a three prong approach to determine if specific jurisdiction exist.  The first

prong is whether Defendant has minimum contacts with the forum state?  Minimum contacts can

be established when tortuous action occurs outside the Commonwealth but causes harm or

tortuous injury in the Commonwealth.  42 Pa. C.S. § 5322(a)(4).  The second prong is whether

Plaintiff's claims "arise out of or relate to those activities".  Helicopteros Nacionales de

Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984).  The third prong is whether personal

jurisdiction over a non-resident comports with fair play and substantial justice.  Burger King

Corp. v. Rudzewicz, 471 US 462, 476 (1986).

1.  THE MOTION FOR LACK OF PERSONAL JURISDICTION SHOULD BE
    DENIED BECAUSE WILLIAM LASAR III WAS THE PRINCIPAL OF LASAR
    MANUFACTURING COMPANY WHO DIRECTED HIS ACTIVITIES AT
    PENNSYLVANIA BY SELLING MEAT GRINDERS TO COMPANIES
    LOCATED IN PENNSYLVANIA

The evidence establishes both general and specific contacts permitting this Court to

exercise jurisdiction over William Lasar, III.

Defendant William Lasar, III had systematic and continuous contact with Pennsylvania

by selling meat grinders to Pennsylvania companies.  The machine that caused Plaintiff's

accident is located in Philadelphia, Pennsylvania.  It is owned by a supermarket on Frankford

Avenue called "American Family Supermarket."  It bears the name of William Lasar, III on its

identification tag stating "Lasar Mfg Company, Inc."  (See Exhibit "B").  Mr. Lasar has been

linked to this company, along with IGB Systems, Inc. and Butcher Boy Limited, who Plaintiffs

believe was his creation to avoid liability in personal injury lawsuits, with identical injuries as

Mr. Hwang's injury.  (See Exhibit "D").  In fact, the web site states the history of the subsequent

companies and their relationship to Lasar Mfg Company, Inc.  (See Exhibit "D").  Mr. Lasar is

the principal or "managing agent" of Lasar Manufacturing, Inc.  Plaintiff believes that Mr.

Lasar's actions are enough to pierce the corporate veil, as was done in a lawsuit against him

already.  (See Verdict Search Article as Exhibit "C").

A read of Mr. Lasar's sworn Affidavit would make this Court think that Plaintiff served

the wrong person.  Mr. Lasar is simply untruthful in his Affidavit.  His assertions are flat out

false, and he should be sanctioned by this Court for perjuring himself.  When Mr. Lasar called

Plaintiff's counsel, he indicated that he was the correct person served. He also informed her that "It was always so unfortunate. We had guards on the machines and people would take them off." Counsel has memorialized the conversation in a memorandum dated October 12, 2009. (See Affidavit marked as Exhibit "E"). Mr. Lasar confirmed that he received the Complaint and that he is the correct person. He also gave Counsel some background information, including the name of the bankruptcy trustee. (See Exhibit "E"). It is hard to believe that Mr. Lasar is now asserting that he was living in Portugal from 1997 to 2001; and England from 1996 to 1997. The Ortega trial occurred on March 28, 1997. Mr. Lasar attended the trial and testified. Plaintiffs are in the process of obtaining the transcripts. Plaintiffs are confident that Mr. Lasar will identify exactly where he was living when the sworn testimony arrives.

Mr. Lasar accepted service of the Complaint in his home. After attempting to serve him in Scotland by going through the Hague Convention, Plaintiffs' process server located him in Texas. Mr. Lasar states in his affidavit that "I specifically informed Ms. Adams that I have no affiliation with the entities named in the lawsuit." In paragraph #4, he states that he is "not affiliated with, have no ownership interest, is not employed or otherwise with any of the entities that have been identified in the lawsuit." **This is a false statement.** Perhaps Mr. Lasar is saying that he currently has no affiliation with the entities named in the lawsuit, however, this does not address his affiliation with them in the past.

Plaintiff also asserts that there is general jurisdiction over Defendant William Lasar III because the three prong test is met. Defendant has minimum contacts with Pennsylvania because he sold Butcher Boy machines in Pennsylvania. The machine bears his name and is located in Philadelphia. Plaintiffs claims arise out of Mr. Lasar's activities of selling Butcher Boy machines in Pennslvania, since his hand and forearm were amputated by the machine. Finally,

the third prong is whether jurisdiction comports with fair play and substantial justice. Defendant

was in the business of selling the meat grinders for a profit. The meat grinder injured Plaintiff.

It is only fair play that Mr. Lasar be required to stand before this court as it relates to Plaintiff's

injuries.

Although Mr. Lasar may be currently working as a realtor and sales manager of an

automobile dealership, he should not be allowed to simply "erase" the first part of his life that

consisted of manufacturing dangerous meat grinders that caused multiple hand amputations to

innocent people such as Mr. Hwang.

2. IF THIS MOTION IS NOT OUTRIGHT DENIED, PLAINTIFFS SHOULD BE
   PERMITTED TO ENGAGE IN DISCOVERY FOR ADDITIONAL EVIDENCE AS
   IT RELATES TO THE 12(b)(2) MOTION.

If Plaintiffs are permitted additional discovery as it relates to this 12(b)(2) motion,

Plaintiffs are confident that it will reveal additional evidence showing that Defendant, William

Lasar III had systematic and continuous contact with Pennsylvania as it relates to his meat

grinding business.

**RELIEF REQUESTED**

Plaintiffs respectfully request that Defendant's Motion to Dismiss for Lack of Personal

Jurisdiction be DENIED.

Respectfully submitted,

**ADAMS RENZI LAW**

BY: _____

Christy Adams, Esquire
Attorney for Plaintiff
Identification No. 74390
1601 Sansom Street, Suite 2C
Philadelphia, PA 19103
215-546-4208

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAE HWAN HWANG, and | : | |
| YOUNG HWANG | : | |
| v. | : | |
| BUTCHER BOY LIMITED d/b/a | : | |
| BUTCHER BOY, and IGB SYSTEMS | : | |
| LTD. d/b/a BUTCHER BOY, and | : | Civil Action No.: 2:09-CV-1178 |
| WILLIAM LASAR III d/b/a BUTCHER | : | |
| BOY, and BUTCHER BOY, and | : | |
| LASAR MANUFACTURING COMPANY, | : | |
| INC. d/b/a BUTCHER BOY, and | : | |
| WESTGLEN CORPORATION d/b/a | : | |
| BUTCHER BOY, and   AMERICAN | : | |
| MEAT EQUIPMENT CORP.    d/b/a | : | |
| BUTCHER BOY, and AMERICAN MEAT | : | |
| EQUIPMENT LLC d/b/a BUTCHER BOY | : | |
| and, BUTCHER BOY, and | : | |
| SIEMENS-FURNAS CONTROLS, and | : | |
| FURNAS ELECTRIC CO. | : | |

## CERTIFICATION OF SERVICE

I, Christy Adams, Esquire, attorney for Plaintiffs, state that on this date, the below-noted Defendants were served with PLAINTIFF'S RESPONSE TO DEFENDANT, WILLIAM LASAR III'S MOTION TO DISMISS FOR LACH OF PERSONAL JURISDICTION:

Steven J. Knight, Esquire
Ryan O. Cantrell, Esquire
1200 Smith Street, Suite 1400
Houston, Texas 77002

Kathleen D. Wilkinson, Esquire
WILSON, ELSER, MOSKOWITZ, EDELMAN & DECKER, LLP
Independence Square West
The Curtis Center, Suite 1130 East
Philadelphia, PA 19106-3308
ATTORNEY FOR SEIMENS FURNAS CONTROLS

Athena Pappas, Esquire
DEASEY MAHONEY & VALENTINI, LTD.
1601 Market Street, Suit 3400
Philadelphia, PA 19103
ATTORNEY FOR AMERICAN MEAT EQUIPMENT CORP.

CERTIFICATE OF SERVICE
PAGE 2

Dated: <u>MARCH 10, 2010</u>

_____
Christy Adams, Esquire
Attorney for Plaintiff
Identification No. 74390
Adams Renzi Law
1601 Sansom Street, Suite 2C
Philadelphia, PA 19103
215-546-4208

# EXHIBIT A



# EXHIBIT B



# EXHIBIT C

Victor Ortega vs. Westglen Corporation



# VERDICTSEARCH

**This email has been sent from <u>VerdictSearch.com</u>.**

........... case#80394 begins here ...........

**Product Liability**

**Products Liability: Food Grinder**
**Verdict:** (P) $3,300,500.00
**Case:** Victor Ortega vs. Westglen Corporation, No. TC 006 859
**Venue:** Superior Court of Los Angeles County, Compton, CA
**Judge:** Jack W. Morgan
**Date:** 03-28-1997
**PLAINTIFF(S)**
**Attorney:**

- William B. Smith; Waldsmith, Abramson & Smith; San Francisco, CA, for Victor Ortega
- Robert J. Waldsmith; Waldsmith, Abramson & Smith; San Francisco, CA, for Victor Ortega

**Expert:**

- John Bilos M.D.; Surgery; Chicago, IL
- Clare Giegrich M.D.; Orthopedic Surgery; Chicago, IL
- Stanley Hunton; Vocational Rehabilitation; Chicago, IL
  VIEW EXPERT'S CASES
- Jack Uellendahl; Prosthetics; Chicago, IL
  VIEW EXPERT'S CASES
- Henry Cheeseman; Business; Los Angeles, CA
- Mark Gutentag; CPAs; Los Angeles, CA
- Thompson David; Ergonomics/Human Factors; Palo Alto, CA
  VIEW EXPERT'S CASES
- Paul Youngdahl P.E.; Design; Palo Alto, CA
  VIEW EXPERT'S CASES

**DEFENDANT(S)**
**Attorney:**

- Paul Lasky; Tharpe & Howell; Los Angeles, CA, for Westglen Corporation
- Paul Wayne; Tharpe & Howell; Los Angeles, CA, for Westglen Corporation

**Expert:**

- Jubin Merati; Economics; Beverly Hills, CA
  ⟨FILM EXPERTS⟩ ⟨VIEW EXPERT'S CASES⟩
- Ralph Barnett; Sciences; Chicago, IL
  ⟨VIEW EXPERT'S CASES⟩

**Insurer:**

- Farmer"s

**Facts:**

2/24/93: Plaintiff was a 24 year-old employee of a frozen pizza manufacturer (Little Lady Foods) located just outside Chicago, IL. Mr. Ortega was operating a Butcher Boy B56 meat grinder to grind cheese. The machine was manufactured in 1954 by Lasar Manufacturing Co. ("LMC") in Los Angeles, CA. Apparently, it was originally sold with a guard over the feed throat, which was simply screwed on and was designed to be removed for cleaning. It also came with a stomper, which fit in a hole in the guard and was designed to push the food product into the grinding mechanism, i.e., a screw conveyor referred to as the feed screw. Plaintiff"s employer bought the grinder in 1984 when it purchased the plant and equipment. The guard and stomper had long since disappeared. Four years before the accident, the employer"s insurance company asked the employer to put a bar guard across the opening of the feed throat of the grinder. The employer promptly complied after it tried without success to contact the manufacturer. Mr. Ortega was feeding bars of cheese into the grinder with his right hand when the rotating feed screw caught the tip of his plastic glove and pulled his hand and arm into the grinder and traumatically amputated it just below the level of his elbow.

Lasar Manufacturing Co. (the manufacturer) was out of business at the time of Mr. Ortega"s injury. It declared Chapter 7 bankruptcy (liquidation) in March 1989. The founder of the company and the designer of the B56 grinder (William Lasar, St.) died in 1982 and his son, William Lasar III, took over the company. William Lasar III immediately took the company into Chapter 11 bankruptcy (reorganization) and ultimately took to Chapter 7 bankruptcy. The two bankruptcies primarily were caused by approximately 200 various personal injury claims asserted against LMC, which consisted mostly of amputations related to its meat processing equipment. During the period 1984 to 1989, William Lasar III gutted LMC by transferring its assets, its functions and its employees to other wholly owned and controlled companies in the United States, Canada and Scotland. The primary beneficiary was Westglen Corporation, which was a wholly owned, and controlled Lasar company in Los Angeles, which took over the lucrative, parts making and service businesses. Upon LMC"s declaration of Chapter 7 bankruptcy, it was nothing more than an empty shell, yet Westglen Corp. continued and prospered under the guidance of its president William Lasar III. Westglen was nothing more than a name change. In the process of transferring LMC"s business, Defendants engaged in a systematic destruction of all of its accident reports and many of its financial records.

**Plaintiff claimed** the Defendants were responsible for design defect, warning defect and negligence. Significant evidence on these issues was the fact that in the early 1960"s LMC made major safety improvements to the B56 grinder, based on the fact that an operator easily could reach under the guard and touch the feed screw. The feed screw also was very accessible when the removable guard was removed. These safety improvements included a new "foolproof guard" that was permanently attached, a lengthened feed throat to move the feed screw farther away from the operator"s fingers and an emergency stop switch. The negligence theory was based on LMC"s and Defendants" failure to do anything to notify owners of the earlier unimproved B56 grinders of the major safety improvements. Defendants had a duty to take all reasonable steps to notify prior owners of these improvements once they had noticed that the earlier version of the machine had dangerous propensities. That duty included a retrofit program, if necessary. Defendants" expert testified that the B56 grinder was expected to last at last 50 years and maybe "forever" if properly maintained. These

grinders are located all over the United States and LMC had records showing the names and addresses of the original owners. Mr. Ortega also sued Defendants William Lasar III and Westglen for intentional spoliation of evidence and conscious disregard of the safety and rights of others. Both theories were a basis for punitive damages in the second phase of the trial. Plaintiff sued Westglen Corp. and William Lasar III, alleging that Westglen was a successor corporation pursuant to Ray vs. Alad (1972) 19 Cal.3d 22 and that both Defendants were the alter egos of LMC.

**Defendant argued** Plaintiff was at fault for putting his hand into the feed throat instead of using a stomper or some other object. Plaintiff's employer was negligent for not adequately guarding the feed throat and not adequately training Mr. Ortega. The machine was very old and there could be no design defect because it was a state of the art machine in 1954. The grinder was altered because someone removed the guard and a stomper was not being used. The machine was misused as a cheese grinder. It was designed to be a meat grinder, which drastically changed its feeding characteristics.

**Injury:**
**Injuries:** Amputation of right (major) hand and two thirds of the forearm. **Residuals:** Plaintiff must wear a myoelectric prosthesis. Continued pain and sensitivity in the right arm stump due to a neuroma. Plaintiff has a very difficult time coping with the ugly appearance of the stump.

**Medical Costs:** $67,793.17 past, $300,684.10 future

**Loss of Earnings:** $16,000 past, $504,788 future

**Verdict Information** Settlement: Offer: $600,000. Demand: $1,000,000 policy limits

Verdict: $3,300,500 total; $950,000 economic damages against Westglen and William Lasar III, $2,000,000 non-economic damages against Westglen and William Lasar III, $350,000 punitive damages against William Lasar III, $500 in damages for intentional spoliation of evidence.

Jury Poll: 12-0

Note: The jury with a unanimous verdict found that Defendants were the alter egos of LMC and that Westglen Corp. was the successor in interest of LMC. The jury also found design defect, warning defect and negligence and that each of these caused Plaintiff's injury. The jury found there was clear and convincing evidence of an intentional spoliation of evidence and a conscious disregard of the safety and rights of others.



Defendant made a motion for new trial. The judge granted the motion on 5/29/97 for limited new trial because the judge felt the Plaintiff was negligent and the jury found no negligence on the Plaintiff's part. He also felt the punitives should not exceed $50,000.

The case settled after both parties filed an appeal.

# EXHIBIT D

# IGBsystems

reaching the limits

manufactured by **Butcher Boy Limited**



**p u s h i n g**

*your production*
*beyond the limits*

**Home**
**company**
**machines**
**parts**
**contact**

## company profile

Butcher Boy was created in 1927 by William Lasar II, at the time a young German engineer emigrant, who designed and built a meat saw for his brother Rudolf's butcher shop in Goleta, California, USA. It never occurred to him that his invention would serve anyone else than his brother. However, a salesman from a butcher supplies company, who made regular sales calls to Rudolf's shop thought differently.

He had never seen or even heard of a meat saw before and asked what it was. The young engineer proudly described his invention and the salesman was very impressed. He said he would return with his sales manager to see if they could perhaps sell some machines.

When the salesman and his manager returned a few days later, they asked to speak to the *young butcher's boy* who designed the meat saw. William (Bill) then met with them and described the purpose of the machine.

In 1927, this was considered a new high tech product and the salesmen were very excited when they made a marketing arrangement to begin selling the meat saws, but, the new product needed a name...

When the salesmen went into the butcher shop looking for Bill, they asked the other butchers if they could speak to the *butcher boy* (a name used at the time to describe a butcher's helper). Since the new saw was a butcher's helper and Bill was working at Rudolf's shop as a butcher's helper, they all decided to name the product BUTCHER BOY, to represent William Lasar II, the inventor of the new meat saw.

From this humble beginning, Bill eventually moved to Los Angeles, California to start Lasar Machine Works, in 1929, which eventually evolved into Lasar Manufacturing Company, Inc.

Over the next 55 years, Bill Lasar designed and created hundreds of machines and thousands of parts with his own hands. He received many United States Patents and contributed greatly to the Meat Processing Industry for his developments with meat saws, meat grinders, automatic meat grinders, mixer-grinders, meat flakers and countless other machines.

In 1980, Bill and his son, William Lasar III, who had worked along side his father for many years, established Butcher Boy Limited in Scotland. This family relationship was very instrumental to the growth of our company over the past twenty years.

Today, Butcher Boy Limited is the world centre for BUTCHER BOY. From our 60,000 sq. ft. factory in Scotland, we design, manufacture and market BUTCHER BOY machines, processing systems and replacement parts to most countries of the world through established distributors and factory sales/service offices.

All of us at Butcher Boy Limited are very proud of our company's heritage and continually strive to maintain the quality, durability and integrity of BUTCHER BOY products which began 75 years ago by a very creative young engineer.

# IGBsystems

reaching the limits

## manufactured by Butcher Boy Limited

**Home**
- company
- machines
- parts
- contact

### Home

Butcher Boy Limited, located in Scotland, manufactures quality, heavy duty, processing equipment for all types of food ranging from chicken, pork, fish, red meat, pet food, fruit and a whole variety of food types.

*Because*
*you cannot afford*

*to make the wrong move*

Thank you for visiting our site. We believe it will enable you to see much of our product line and capabilities.

    

We offer many variations of our products and manufacture special machines and systems to customer specifications for all types of food and other materials.

If you would like further information regarding any of our products, please contact us.

To receive a copy of the latest IGB Systems brochure, click here

For our latest news items, click here

Copyright Information



**IGBsystems**
reaching the limits

manufactured by **Butcher Boy Limited**

contact

HOME
company
machines
parts
contact

**Butcher Boy Limited**
Lochview Road
Willowyard
Beith
Ayrshire, KA15 1JB
Scotland
United Kingdom

Telephone: 01505 503449
Telephone (international): +44 (0) 1505 503449

Fax (UK):  01505 504319
Fax (international): +44 (0) 1505 504319

Email: enquiries@butcherboy.net

✉ Email Contacts:

Machine and System Sales
sales@butcherboy.net

Replacement Parts
parts@butcherboy.net

Engineering
dtucker@butcherboy.net

Purchasing
purchasing@butcherboy.net

Online Enquiry Forms:

Brochure Requests: click here

Parts Enquiries and Catalogues: click here

Machine / System Enquiries: click here

# EXHIBIT E

# **AFFIDAVIT OF CHRISTY ADAMS, ESQUIRE**

I, Christy Adams, Esquire, had a telephone conversation with William Lasar III, the content of that conversation is memorialized in the 10/12/09 memorandum attached to this Affidavit.

The content of the Memorandum and this Affidavit is true and correct to the best of my knowledge, information and belief; and that this statement is made subject to the penalties of  relating to unsworn falsifications to authorities.

CHRISTY ADAMS, ESQUIRE

DATE:  March 9, 2010

# MEMORANDUM
# ADAMS RENZI LAW

TO:        FILE

FROM:      CHRISTY

DATE:      10/12/09

RE:        HWANG

TODAY I RECEIVED A TELEPHONE CALL FROM WILLIAM LASAR III. HE
CONFIRMED THAT HE RECEIVED THE COMPLAINT AND THAT HE WAS THE
CORRECT PERSON. HE SAID THAT HE IS RETIRED NOW IN TEXAS AND IS
LIVING ON SOCIAL SECURITY. I ASKED HIM WHETHER HE HAD ANY
INSURANCE AND HE INDICATED THAT HE DID NOT.

I ASKED HIM ABOUT IGB SYSTEMS IN SCOTLAND AND HE INDICATED
THEY WERE NO LONGER IN BUSINESS.

HE SAID THAT LAWRENCE DIAMOND WAS THE TRUSTEE OF THE
BANKRUPTCY CASE WITH LASAR MANUFACTURING AND THEY SUED
WESTGLEN. ULTIMATELY, HE ENDED UP GIVING WESTGLEN TO
LAWRENCE DIAMOND, SINCE IT HAD VALUE. HE SAID THAT LAWRENCE
DIAMOND RAN WESTGLEN WITH HIS EX-WIFE FOR ABOUT 3 MONTHS AND
THEN IT WAS SOLD TO WWW.BUTCHERBOYMACHINES.COM. THIS IS
AMERICAN MEAT EQUIPMENT. HE SAID AMERICAN MEAT WAS IN LOS
ANGELOS, BUT NOW, THEY ARE SOMEWHERE ELSE.

HE SAID, "IT WAS ALWAYS SO UNFORTUNATE." "WE HAD GUARDS ON THE
MACHINES AND PEOPLE WOULD TAKE THEM OFF." I INFORMED HIM THAT
WHEN MY CLIENT INTERACTED WITH THE MACHINE, A GUARD WAS NOT
EVEN AN OPTION BECAUSE IT DID NOT EXIST. I TOLD HIM IT LOOKED LIKE
THE MACHINE WAS MADE IN THE '50S AND IT HAD A LASAR
MANUFACTURING LOGO ON IT. HE SAID THAT HE WAS A BABY WHEN THE
MACHINE WAS MADE.

His PHONE IS 832-818-2798; wlasar@yahoo.com.